# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| **TRANSCEND SHIPPING SYSTEMS, LLC,**<br>*Plaintiff,*<br><br>v.<br><br>**MAERSK, INC., A.P. MOLLER –<br>MAERSK A/S, AND MAERSK LINE<br>LTD.,**<br>*Defendants.* | **Case No. 6:20-cv-01122**<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Transcend Shipping Systems, LLC ("Transcend") hereby files this Original Complaint for Patent Infringement against A.P. Moller – Maersk A/S ("APM"), Maersk, Inc. and Maersk Line Ltd., (collectively "Maersk" or "Defendants"), and alleges, upon information and belief, as follows:

## THE PARTIES

1.  Transcend is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.  Upon information and belief, Defendant A.P. Moller – Maersk A/S ("APM") is a Danish company with its principal place of business at Esplanaden 50, 1098 Copenhagen K, Denmark. On information and belief, APM may be served with process at Esplanaden 50, 1098 Copenhagen K, Denmark.

3.     Upon information and belief, Defendant Maersk, Inc. is a New York corporation with its principal place of business at 2 Giralda Farms, Madison, NJ, 07940-1026. Defendant Maersk, Inc. may be served with process via its registered agent, CT Corporation System, 350 N. Saint Paul St., Ste. 2900, Dallas, TX, 75201-4234.

4.     Upon information and belief, Defendant Maersk Line Ltd. ("Maersk Line") is a Delaware company with its principal place of business at One Commercial Place, Ste. 2000, 20th Floor, Norfolk, VA, 23510-2126. Upon information and belief, Defendant Maersk Line may be served with process via its registered agent, CT Corporation System, 350 N. Saint Paul St., Ste. 2900, Dallas, TX, 75201- 4234.

## JURISDICTION AND VENUE

5.     Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

6.     The Court has personal jurisdiction under the Texas Long Arm Statute and the Due Process Clause of the U.S. Constitution over Defendants because they are present within or have minimum contacts within the State of Texas, including the Western District of Texas.

7.     Defendants have purposefully availed themselves of the privileges of conducting business in the State of Texas.  "Maersk Texas" is a U.S. flagged multi-purpose cargo ship they own.

 

8.      Defendants have sought protection and benefit from the laws of the State of Texas; Defendants regularly conduct business within the State of Texas and within the Western District of Texas; and Plaintiff's cause of action arises directly from Defendants' business contacts and other activities in the State of Texas and in the Western District of Texas.

| | |
|---|---|
| Office<br><br>**Houston**<br><br>**Address**<br><br>Maersk, Customer Resource Center, 8686 New Trails Drive Woodlands, TX, Houston, USA, 77381-1190 | Port<br><br>**Houston**<br><br>**Address**<br><br>111 East Loop North (77029)<br>P.O. Box 2562 (77252-2562)<br>Houston, TX 77252-2562<br>United States |

9.      More specifically, Defendants, directly and/or through intermediaries, ship, distribute, use, offer for sale, sell, and/or advertise products and services in the United States, the State of Texas, and the Western District of Texas including but not limited to the Accused Instrumentalities as detailed below. Upon information and belief, Defendants have committed patent infringement in the State of Texas and in the Western District of Texas. Defendants solicit and have solicited customers in the State of Texas and in the Western District of Texas. Defendants have paying customers, who are residents of the State of Texas and the Western District of Texas, who each use and have used the Defendants' products and services in the State of Texas and in the Western District of Texas.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b).

11.     Venue is also proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c)(3) because Defendant A.P. Möller – Mærsk A/S ("APM") is not a resident of the United States and therefore may be sued in any judicial district.

**PATENTS-IN-SUIT**

12.  Transcend Shipping Systems, LLC is the sole and exclusive owner, by assignment, of U.S. Patent Nos. 7,253,731 ("the '731 Patent"); 7,482,920 ("the '920 Patent"); 9,847,029 ("the '029 Patent"); 10,181,109 ("the '109 Patent"); and 10,796,268 ("the '268 Patent") (hereinafter collectively referred to as "the Transcend Patents").

13.  The Transcend Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

14.  The Transcend Patents each include numerous claims defining distinct inventions.

15.  The priority date of each of the Transcend Patents is at least as early January 23, 2001. As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.

16.  Plaintiff alleges infringement on the part of Defendants of each of the Transcend Patents.

17.  The '731 Patent relates generally to an apparatus, including a shipment conveyance device, associated with a shipment, which is a shipping a container, pallet, or tote, a memory device, located at the shipment conveyance device, in which information regarding the shipment is stored, a global positioning device, located at the shipment conveyance device, which determines a position or location of the shipment conveyance device, a processing device which processes information regarding the shipment and/or shipment conveyance device in response to an occurrence of an event or in response to a request for information and generates a message containing information regarding the position or location of the shipment conveyance device and information regarding the occurrence of an event, a status of the shipment, a shipment temperature, or an impact or force on the shipment conveyance

device, and a transmitter, located at the shipment conveyance device, which transmits the message to a communication device. *See* Abstract, '731 Patent.

18.    The '920 Patent relates generally to an apparatus, including a shipment conveyance device which is a shipping container, pallet, piece of luggage, or tote, a memory device located in, on, or at, the shipment conveyance device which stores information regarding the shipment conveyance device, a global positioning device located in, on, or at, the shipment conveyance device which determines a position or location of the shipment conveyance device, a processing device which processes information regarding the shipment conveyance device in response to an occurrence of an event or a request for information and which generates a message containing information regarding the position or location of the shipment conveyance device and information regarding the occurrence of an event, a status of a shipment or transportation involving the shipment conveyance device, a temperature, or an impact or force on the shipment conveyance device, and a transmitter located in, on, or at, the shipment conveyance device which transmits the message to a communication device. *See* Abstract, '920 Patent.

19.    The '029 Patent relates generally to an apparatus, including a shipment conveyance device which is a shipping container, pallet, or piece of luggage, a memory device located in, on, or at, the shipment conveyance device which stores information regarding the shipment conveyance device, a global positioning device which determines a position or location of the shipment conveyance device, a processing device which processes information regarding the shipment conveyance device in response to an occurrence of an event or a request for information and which generates a message containing information regarding the position or location of the shipment conveyance device and information regarding the occurrence of an

event, a status of a shipment or transportation involving the shipment conveyance device, a temperature, or an impact or force on the shipment conveyance device, and a transmitter located in, on, or at, the shipment conveyance device which transmits the message to a communication device. *See* Abstract, '029 Patent.

20.    The '109 Patent relates generally to an apparatus, including a shipment conveyance device, wherein the shipment conveyance device is a shipping container, pallet, or piece of luggage; a receiver; a global positioning device which is located in, on, or at, the shipment conveyance device and which determines a position or location of the shipment conveyance device; a processor which generates a message in response to an occurrence of an event or in response to a request for information regarding the shipment conveyance device, wherein the request for information is automatically received by the receiver, wherein the message contains information regarding a position or location of the shipment conveyance device; and a transmitter which is located in, on, or at, the shipment conveyance device and which transmits the message to a communication device associated with an owner of the shipment conveyance device or an individual authorized to receive the message. *See* Abstract, '109 Patent.

21.    The '268 Patent relates generally to an apparatus, including a shipment conveyance device which is a shipping container, a pallet, or a piece of luggage; a global positioning device, located in, on, or at, the shipment conveyance device, which determines a position or location of the shipment conveyance device; a processor which generates a message in response to an occurrence of an event or in response to a request for information regarding the shipment conveyance device which request is automatically received by a receiver, and which message contains information regarding a shipment of the shipment conveyance device; and a

transmitter, located in, on, or at, the shipment conveyance device, which transmits the message to a communication device associated with an owner of the shipment conveyance device or an individual authorized to receive the message. *See* Abstract, '268 Patent.

22. The claims of the Transcend Patents are not drawn to laws of nature, natural phenomena, or abstract ideas. Although the systems and methods claimed in the Transcend Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, was not conventional or routine at the time of the invention.

23. The '731 Patent was examined by Primary United States Patent Examiner Van T. Trieu. During the examination of the '731 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 340/539.13, 340/568.1 and 340/572.1.

24. After conducting searches for prior art during the examination of the '731 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the searches: (i) US 3,669,288, 06/1972, Young; (ii) US 5,317,323, 05/1994, Kennedy et al.; (iii) "Envirokare announces letter of intent with Electroship . . ." 2 page Envirokare press release dated Jul. 25, 2000"; (iv) US 5,825,283, 10/1998, Camhi; (v) US 6,044,990, 04/2000, Palmeri; (vi) US 6,464,142, 10/2002, Denenberg et al.; (vii) US 2002/0017996, 02/2002, Niemiec; (viii) FR 2816434, 05/2002, Touzet; (ix) US 5,877,707, 03/1999, Kowalick; (x) US 5,917,405, 06/1999, Joao; (xi) US 5,917,434, 06/1999, Murphy; (xii) US 6,046,678, 04/2000, Wilk; (xiii) US 6,148,291, 11/2000, Radican; (xiv) US 6,281,797, 08/2001, Forster et al.; (xv) US 6,292,828, 09/2001, Williams; (xvi) US 6,332,098, 12/2001, Ross et al.; (xviii) US 6,474,927, 11/2002, McAdams et al.; (xix) US 6,542,076, 04/2003, Joao; (xx) US 6,542,077, 04/2003, Joao; (xxi) US 6,549,130, 04/2003,

Joao; (xxii) US 6,587,046, 07/2003, Joao; (xxiii) US 6,610,954, 08/2003, Takizawa; (xxiv) US 6,844,473, 01/2005, Quinlin et al.; (xxv) US 2002/0016655, 02/2002, Joao; (xxvi) US 2002/0049622, 04/2002, Lettich et al.; (xxvi) US 2002/0049622, 04/2002, Lettich et al.; (xxvii) US 2002/0116318, 08/2002, Thomas et al.; (xxviii) US 2002/0121969, 09/2002, Joao; (xxix) US 2002/0198774, 12/2002, Weirich; (xxx) US 2003/0009361, 01/2003, Hancock et al.; (xxxi) US 2003/0016130, 01/2003, Joao; (xxxii) US 2003/0067541, 04/2003, Joao; (xxxiii) US 2003/0071899, 04/2003, Joao; (xxxiv) US 2003/0084125, 05/2003, Nagda et al.; (xxxv) US 2003/0193404, 10/2003, Joao; (xxxvi) US 2003/0206102, 11/2003, Joao; (xxxvii) US 2004/0160319, 08/2004, Joao; (xxxviii) US 2004/0230601, 11/2004, Joao; (xxxix) US 2005/0171835, 08/2005, Mook et al.; (xxxx) US 2005/0248444, 11/2005, Joao; (xxxxi) "Technology Executive . . . joins Envirokare as president and Director", 2 page Envirokare press release dated Sep. 5, 2000; and (xxxxii) "Envirokare Tech Inc. announces additions to advisory board", 3 page Envirokare press release dated Sep. 7, 2000.

25.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '731 Patent to issue.  In so doing, it is presumed that Examiner Trieu used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Trieu has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

26.   The '731 Patent is a pioneering patent, and has been cited as relevant prior art in over 130 subsequent United States Patent Applications, including Applications assigned to technology

and business leaders such as Google, Inc., AT&T, FedEx, Qualcomm, Inc., Fujitsu, Ltd., United Parcel Services of America, American Airlines and NEC Corp.

27.    The '920 Patent was examined by Primary United States Patent Examiner Van T. Trieu. During the examination of the '920 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 340/539.11, 340/568.1 and 340/572.1.

28.    After conducting searches for prior art during the examination of the '731 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the searches: (i) US 5,825,283, 10/1998, Camhi; (ii)  US 6,046,678, 04/2000, Wilk; (iii) US 6,148,291, 11/2000, Radican; (iv) US 6,323,782, 11/2001, Stephens et al.; (v) US 6,429,810, 08/2002, De Roche; (vi) US 6,610,954, 08/2003, Takizawa; (vii) US 6,745,027, 06/2004, Twitchell, Jr.; and (viii) US 6,882,269, 04/2005, Moreno.

29.    After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '920 Patent to issue.  In so doing, it is presumed that Examiner Trieu used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Trieu has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

30.    The '920 Patent is a pioneering patent, and has been cited as relevant prior art in over 130 subsequent United States Patent Applications, including Applications assigned to technology and business leaders such as Google, Inc., AT&T, FedEx, Qualcomm, Inc., Fujitsu, Ltd., United Parcel Services of America, American Airlines and NEC Corp.

31.  The '029 Patent was examined by Primary United States Patent Examiner Van T. Trieu.

During the examination of the '029 Patent, the United States Patent Examiner searched for

prior art in the following US Classifications: G08G 1/20, G01S 13/84, G06Q 10/08, G06Q

10/087, G08B 1/08, G08G 1/202, G08G 1/205, H04W 4/02, and H04W 4/021.

32.  After conducting searches for prior art during the examination of the '029 Patent, the United

States Patent Examiner identified and cited the following as the most relevant prior art

references found during the searches: (i) US 5,640,002, 06/1997, Ruppert et al.; (ii) US

5,825,283, 10/1998, Camhi; (iii)   US 5,959,568, 09/1999, Woolley; (iv) US 6,046,678,

04/2000, Wilk; (v) US 6,148,291, 11/2000, Radican; (vi) US 6,281,797, 08/2001, Forster et

al.; (vii) US 6,304,856, 10/2001, Soga; (viii) US 6,356,802, 03/2002, Takehara; (ix) US

6,411,891, 06/2002, Jones; (x) US 6,429,810, 08/2002, De Roche; (xi) US 6,610,954,

08/2003, Takizawa; (xii) US 6,745,027, 06/2004, Twitchell, Jr.; (xiii) US 6,748,318,

06/2004, Jones; (xix) US 6,859,722, 02/2005, Jones; (xx) US 6,882,269, 04/2005, Moreno;

(xxi) US 6,904,359, 06/2005, Jones; (xxii) US 7,035,856, 04/2006, Morimoto; (xxiii) US

7,085,775, 08/2006, Short et al.; (xxiv) US 7,212,829, 05/2007, Lau et al.; (xxv) US

2002/0046173, 04/2002, Kelly; (xxvi) US 2002/0061758, 05/2002, Zarlengo et al.; (xxvii)

US 2002/0120475, 08/2002, Morimoto; and (xxviii) US 2002/0132855, 07/2003, Swan.

33.  After giving full proper credit to the prior art and having conducted a thorough search for all

relevant art and having fully considered the most relevant art known at the time, the United

States Patent Examiner allowed all of the claims of the '029 Patent to issue.  In so doing, it is

presumed that Examiner Trieu used his or her knowledge of the art when examining the

claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is

further presumed that Examiner Trieu has experience in the field of the invention, and that

the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

34.  The '029 Patent is a pioneering patent, and has been cited as relevant prior art in over 130 subsequent United States Patent Applications, including Applications assigned to technology and business leaders such as Google, Inc., AT&T, FedEx, Qualcomm, Inc., Fujitsu, Ltd., United Parcel Services of America, American Airlines and NEC Corp.

35.  The '109 Patent was examined by Primary United States Patent Examiner Van T. Trieu. During the examination of the '109 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G06Q 10/08, G06Q 10/083, G06Q 10/087, H04W 4/02, and H04W 4/021.

36.  After conducting searches for prior art during the examination of the '109 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the searches: (i) US 5,959,568, 09/1999, Woolley; (ii) US 7,035,856, 04/2006, Morimoto; (iii) US 7,212,829, 05/2007, Lau et al.; (iv) US 7,253,731, 08/2007, Joao; (v) US 9,847,029, 12/2017, Joao; and (vi) US 2002/0120475, 08/2002, Morimoto.

37.  After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '109 Patent to issue.  In so doing, it is presumed that Examiner Trieu used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Trieu has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

38.    The '109 Patent is a pioneering patent, and has been cited as relevant prior art in over 130 subsequent United States Patent Applications, including Applications assigned to technology and business leaders such as Google, Inc., AT&T, FedEx, Qualcomm, Inc., Fujitsu, Ltd., United Parcel Services of America, American Airlines and NEC Corp.

39.    The '268 Patent was examined by Primary United States Patent Examiner Van T. Trieu. During the examination of the '268 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G06Q 10/08 and G06Q 10/083.

40.    After conducting searches for prior art during the examination of the '268 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the searches: (i) US 5,959,568, 09/1999, Woolley; (ii) US 6,148,291, 1/2000, Radican; (iii) US 6,492,904, 12/2002, Richards; (iv) US 7,035,856, 04/2006, Morimoto; (v) US 10,181,109, 01/2019, Joao; and (vi) US 2002/0111819, 08/2002, Li.

41.    After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '268 Patent to issue.  In so doing, it is presumed that Examiner Trieu used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Trieu has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

42.    The '268 Patent is a pioneering patent, and has been cited as relevant prior art in over 130 subsequent United States Patent Applications, including Applications assigned to technology

and business leaders such as Google, Inc., AT&T, FedEx, Qualcomm, Inc., Fujitsu, Ltd., United Parcel Services of America, American Airlines and NEC Corp.

43. The claims of the Transcend Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration. *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.' Much to the contrary, a patent does have value beyond its expiration date. For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

44. The expiration dates of the Transcend Patents are at least the following: the '731 Patent expired on August 7, 2019 due to nonpayment of maintenance fees; the '920 Patent expires no earlier than April 27, 2022; the '029 Patent expires no earlier than November 1, 2023; the '109 Patent expires no earlier than January 22, 2022; and the '268 Patent expires no earlier than January 22, 2022.

## ACCUSED INSTRUMENTALITIES

45. Upon information and belief, Defendants sell, advertise, offer for sale, use, or otherwise provide reefer cargo shipping containers such as the 20' Standard Reefer, 40' High Cube Standard Reefer, 40' High Cube Magnum Reefer, 40' High Cube StarCare and/or 40' High Cube Super Freezer (each being a "shipment conveyance device" or "shipping container") for shipping and/or delivering goods, products, items, and/or other objects which are

equipped with Maersk Remote Container Management (RCM) technology/systems ("Accused Instrumentalities") that infringe the Transcend Patents.

## COUNT I

### (Infringement of U.S. Patent No. 10,181,109)

46.   Plaintiff incorporates the above paragraphs by reference.

47.   Defendants have been on actual notice of the '109 Patent at least as early as the date it received service of this Original Complaint.

48.   On information and belief, Defendants own and control the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

49.   Upon information and belief, Defendants have directly infringed and continues to directly infringe at least claims 1, 8, 10, 13 and 14 of the '109 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

50.   Defendants, with knowledge of the '109 Patent, also infringe at least claims 1, 8, 10, 13 and 14 of the '109 Patent by inducing others to infringe the '109 Patent.   In particular, Defendants intend to induce its customers to infringe the '109 Patent by encouraging its customers to use the Accused Instrumentalities in a manner that results in infringement.

51.   Defendants also induce others, including its customers, to infringe at least claims 1, 8, 10, 13 and 14 of the '109 Patent by providing technical support for the use of the Accused Instrumentalities.

52.   Upon information and belief, Defendants make, use, sell and offer for sale an apparatus, comprising, a shipment conveyance device, wherein the shipment conveyance device is a shipping container, a pallet, or a piece of luggage.   For example, Defendants provide reefer cargo containers such as 20' standard Reefer, 40' High Cube Standard Reefer, 40' High Cube

Magnum Reefer, 40' High Cube StarCare and/or 40' High Cube Super Freezer (each being a "shipment conveyance device") for shipping and/or delivering goods, products, items, and/or other objects.  Further, the cargo containers are equipped with Maersk Remote Container Management (RCM) technology/system. Remote Container Management (RCM) employs a network of sensors and GPS device to monitor the cargo, container, and the environment inside the container.  See Figures 1-6 below, which are screenshots of webpages found on www.maersk.com.



Figure 1[1]

---

[1] Source: As visited on December 9, 2020,  https://www.maersk.com/solutions/shipping/ocean-transport/refrigerated-cargo.



Figure 2[2]



Figure 3[3]

---

[2] Source: As visited on December 9, 2020, https://www.maersk.com/solutions/shipping/ocean-transport/refrigerated-cargo.

[3] Source: As visited on December 9, 2020, https://remotecontainermanagement.maersk.com/rcmcomm/public/supportpage/benefits.

The world's smartest metal boxes

Of course, Remote Container Management is not the only advanced technology inside our state-of-the-art reefer containers. Innovations like Starcare™ Controlled Atmosphere and SuperFreeze make our containers the smartest metal boxes in the shipping industry.

Figure 4[4]



# MAERSK LINE TO LAUNCH REMOTE CONTAINER MANAGEMENT TECHNOLOGY

Maersk Line has set a 24 July launch date for its new Remote Container Management (RCM) technology.

The product will provide Maersk Line customers with a reefer's location, power status and the atmospheric conditions and temperature inside the container.

The company's staff will manage the container, either remotely or through notifications to local technicians if a hands-on fix is required.

Figure 5[5]

---

[4] Source:  As visited on December 9, 2020,
https://remotecontainermanagement.maersk.com/rcmcomm/public/supportpage/benefits.

[5] Source: As visited on December 9, 2020,
https://container-mag.com/2017/06/27/maersk-line-launch-remote-container-management-technology/

> In a statement, Maersk Line described the technology as "relatively simple". A GPS, a modem and a SIM card on all 270,000 of Maersk's reefer containers enables readings to be continuously collected and stored. That information then reaches customers and global support teams via satellite transmitters on 400 of the company's ships.
>
> Cargo information will be provided during land transport, not just at sea. One benefit of this, the company said, is that if a reefer is not being pre-cooled as agreed at the farm, the customer can see this in the temperature graph on their screen and can follow-up with the supplier and the farm.
>
> Likewise, if a truck driver or port worker turns of the power to the reefer, this will be visible to the customer who can then act on that information. The system can also alert customers if a container malfunctions so that the customer can act accordingly.

Figure 6[6]

53.     Upon information and belief and by way of example, the 20' Standard Reefer uses a global positioning device, wherein the global positioning device is located in, on, or at, the shipping container, and further wherein the global positioning device determines a position or location of the shipping container.  See Figures 7-12 below, which are screenshots of webpages found on www.maersk.com, that describes how the global positioning system on the reefer container enables customers to track the location of their cargo at all times.

> # MAERSK LINE TO LAUNCH REMOTE CONTAINER MANAGEMENT TECHNOLOGY
>
> Maersk Line has set a 24 July launch date for its new Remote Container Management (RCM) technology.
>
> The product will provide Maersk Line customers with a reefer's location, power status and the atmospheric conditions and temperature inside the container.
>
> The company's staff will manage the container, either remotely or through notifications to local technicians if a hands-on fix is required.

Figure 7[7]

---

[6] Source: As visited on December 9, 2020, https://container-mag.com/2017/06/27/maersk-line-launch-remote-container-management-technology/.

In a statement, Maersk Line described the technology as "relatively simple". A GPS, a modem and a SIM card on all 270,000 of Maersk's reefer containers enables readings to be continuously collected and stored. That information then reaches customers and global support teams via satellite transmitters on 400 of the company's ships.

Cargo information will be provided during land transport, not just at sea. One benefit of this, the company said, is that if a reefer is not being pre-cooled as agreed at the farm, the customer can see this in the temperature graph on their screen and can follow-up with the supplier and the farm.

Likewise, if a truck driver or port worker turns of the power to the reefer, this will be visible to the customer who can then act on that information. The system can also alert customers if a container malfunctions so that the customer can act accordingly.

Figure 8[8]

### Reinforcing your promise with groundbreaking RCM technology

To ensure that pharmaceutical cargo is stored in the perfect environment from pick up through to delivery, each of our refrigerated containers is digitally connected to a central monitoring hub via a system we call Remote Container Management (RCM).

RCM allows us to monitor and record every container's location, power status, temperature, humidity and ventilation settings throughout the entire journey. And to improve the visibility of your cold chain, we provide you with full access to your reefer performance data.

Thanks to this groundbreaking innovation, you can provide your customers with full visibility of the cargo they have entrusted you with, thereby reinforcing your promise to them.

- Know exactly where every container is throughout its entire journey

- Know the conditions of transport for the entire journey – specifically the precise temperature inside the container

- Meet quality assurance standards during tenders

- Optimise quality assurance for tenders

- Share data with your customers and third parties, such as insurance companies

- Precise temperature control throughout the shipping process

Figure 9[9]

---

[7] Source: As visited on December 9, 2020,  https://container-mag.com/2017/06/27/maersk-line-launch-remote-container-management-technology/.

[8] Source: As visited on December 9, 2020,  https://container-mag.com/2017/06/27/maersk-line-launch-remote-container-management-technology/.

## See inside the box

Remote Container Management brings unrivalled transparency to the shipping of your temperature-sensitive cargo. Internal sensors gather real-time data – covering everything from temperature and humidity to CO2 levels – to let you know exactly what is happening inside the box, 24/7. Remote Container Management also facilitates real-time GPS tracking of your container and monitors and records the power status, keeping you up to date for the entire journey.

With Remote Container Management, potential issues can be identified and solved immediately, at any time during transit. The result? Your cargo arrives at its destination on schedule and in peak condition.

## The easy-to-use Remote Container Management platform

- Monitor your cargo 24/7 with the easy-to-use Remote Container Management platform
- End-to-end transparency and better quality cargo upon arrival
- Follow your cargo's journey
- No unexpected surprises upon arrival
- Build customer trust with consistent reliability
- Download all of your shipping data into a single Excel document

Figure 10[10]

## Complete transparency during the entire journey

With GPS tracking, you know exactly where your cargo is during the entire journey, how long it has been in transit and exactly when it will arrive.

- Improved security for your cargo
- Vastly reduced risk of lost cargo
- Keep your customers informed of arrival times
- Precise GPS time-in-transit data

Figure 11[11]

---

[9]  Source: https://www.maersk.com/solutions/shipping/ocean-transport/refrigerated-cargo/pharmaceuticals

[10]  Source: https://www.maersk.com/solutions/shipping/remote-container-management/services

[11]  Source: https://www.maersk.com/solutions/shipping/remote-container-management/services



**Can I track my container at all times?**

Our GPS technology works in the same manner as the technology in your cell phone. While GPS provides close to global coverage, it requires clear access to the sky to transmit the container location. This means that there may be situations where containers cannot be tracked.

If the container is off power, the GPS will still transmit, but there may be a decrease in the number of updates reflected on the tracking screen.

**Can I find the exact location of my container?**

The container location is marked on the map with a green highlight. The origin, destination and transshipment ports are marked with blue and grey balloons.

The actual GPS readings of the container can be plotted by ticking the "Show route"box in the upper right corner.



Figure 12[12]

**When is datalog information accessible?**

Datalog information is recorded by the reefer throughout the journey except when the container is off power. The data is updated on Remote Container Management every 24 hours when the container is on a Maersk Vessel or when it is within GSM coverage. If the container is not on a Maersk Line vessel or within GSM coverage the data will be stored in the reefer and transmitted to Remote Container Management when the container is back within GSM coverage.

The data is stored and will be available through Remote Container Management for six months from start of the container journey.

Figure 13[13]

---

[12]  Source: As visited on December 9, 2020, https://remotecontainermanagement.maersk.com/rcmcomm/public/supportpage/productspecification/#tabId=1

[13]  Source: As visited on December 9, 2020, https://remotecontainermanagement.maersk.com/rcmcomm/public/supportpage/productspecification/#tabId=2.

54.     Upon information and belief and by way of example, the 20' Standard Reefer also includes a processor, wherein the processor generates a message in response to the occurrence of an event or in response to a request for information regarding the position or location of the shipping container, tampering with cargo, deviation in temperature, deviation in humidity, deviation in $CO_2$, load-loss, theft, delay, deviation in planned route, cargo impact, shock and/or damage.   By way of example, Defendants utilize Captain Peter, a visibility tool, to provide its customers a dashboard/portal where its customers track their shipments and view information and alerts ("messages") regarding the shipment as well as the shipping container, and therefore, provides a message in response to the occurrence of an event or in response to a request for information.   See Figures 14-16 below, which are screenshots of webpages found at www.maersk.com, describing the functionality of and information provided to customers by Defendants' remote container management system. A processor is necessarily required to provide such functionality and information.



Figure 14[14]

[14]  Source: As visited on December 9, 2020,
https://www.maersk.com/solutions/shipping/remote-container-management

**Why Captain Peter?**

**Monitor your cargo while it's in transit**

The overwhelming majority of cargo journeys go as planned, and your cargo arrives as you expected. However, if something unexpected does happen, Captain Peter will both notify you as soon as possible and help resolve the problem for you.

Figure 15[15]



Figure 16[16]

55.     Upon information and belief, Defendants provide a transmitter, wherein the transmitter is located in, on, or at, the shipment conveyance device, and further wherein the transmitter transmits the message to a communication device associated with an owner of the shipment conveyance device, a receiver of the shipment conveyance device, or an individual

---

[15]  Source: As visited on December 9, 2020,  https://remotecontainermanagement.com/.

[16] Source: As visited on December 9, 2020,  https://www.maersk.com/solutions/shipping/remote-container-management/services.

authorized to receive the message.  For example, the reefer cargo containers ("shipment conveyance device") send information ("message") including one or more of, but not limited to, container's location, power status, temperature, humidity, $CO_2$ levels and ventilation settings, to Defendants' customers via Remote Container Management (RCM). As a result, Defendants' customers monitor their shipments present in the shipping containers using a dashboard/portal provided by Defendants. Therefore, the containers comprise a transmitter for transmitting a message to a communication device associated with at least an owner or a receiver of the shipment conveyance device (*See* Figures 9-16 above). See also Figures 17-22 below, which are screenshots of webpages found at www.maersk.com, indicating that messages containing information are sent to Defendants' customers.



Figure 17[17]

---

[17] Source: As visited on December 9, 2020,  https://www.maersk.com/-/media/ml/files/rcm/pdf/rcm_brochure_for_pharmaceuticals.pdf.

**Copenhagen, Denmark ---** Maersk has released its revamped Remote Container Management (RCM) platform featuring the virtual assistant Captain Peter. Since its launch to customers in September 2017, over 3,600 companies have signed up for RCM and the transparency on information from the over 380,000 refrigerated containers of the combined fleet of Maersk and Hamburg Süd it provides.

"Over the last two years, our RCM product has proven good value to our reefer customers, but we have also identified key areas of improving such a cargo visibility tool," explains Ken West, Reefer Digital Development Manager at Maersk. "With Captain Peter, we are significantly elevating the customer experience of working with the data and building the foundation for delivering even more advanced features around it."

Captain Peter keeps an eye on the container's temperature, humidity, and $CO_2$ levels, and notifies the customer if something needs attention. The data is now cloud-based for increased agility and can be easily shared as well as configured to the customer's specific needs.

Wiskerke has been one of the key customers involved in the development of Captain Peter. When it comes to tracking their reefer shipments, the visibility offered makes the tool a clear winner for the company.

"I choose Maersk and Captain Peter over others because I can see what is happening with my cargo. You can't imagine the pain I'm feeling when I can't see what is happening during the voyage," says Chayenne Wiskerke, Managing Director of Wiskerke Onions.

Maersk plans to continue the dialogue with customers and add even more advanced features to the new reefer platform going forward, delivering value to the customers' businesses through digital innovation.

Figure 18[18]

---

[18] Source: As visited on December 9, 2020,
https://www.maersk.com/news/articles/2019/12/03/maersk-launches-new-visibility-tool-captain-peter.



Figure 19[19]



Figure 20[20]

---

[19] Source: As visited on December 9, 2020, https://www.maersk.com/solutions/shipping/ocean-transport/refrigerated-cargo/fruit-and-vegetables.



Figure 21[21]

RCM by Captain Peter

Using our experience with shipping perishable goods, and data from over a hundred sensors on our reefer containers, we predict cargo impact and even let you control the ripening of your cargo.

Figure 22[22]

56.  Upon information and belief, Defendants provide a sensor, wherein the sensor monitors or measures a temperature during a shipment or a transportation of the shipment conveyance device, a shock exerted on the shipment conveyance device, an impact exerted on the

---

[20] Source: As visited on December 9, 2020,  https://remotecontainermanagement.com/.

[21] Source: As visited on December 9, 2020,  https://remotecontainermanagement.com/.

[22] As visited on December 9, 2020, Source:
https://maerskdigital.io/#Come%20work%20with%20us.

shipment conveyance device, or a force exerted on the shipment conveyance device.  This element is infringed literally, or in the alternative, under the doctrine of equivalents. For example, Defendants' shipping containers comprise sensors including at least one or more of, but not limited to, a vibration sensor, temperature sensor, shock sensor, motion sensor and tamper sensor for measuring at least one or more of, but not limited to, temperature, shock, impact, motion and tampering experienced by the container during transportation. Therefore, Defendants' apparatus comprises sensors that monitor and measure at least one or more of, but not limited to, temperature, shock, impact and force experienced by the shipment conveyance device (*See* Figures 9, 10, 16-18 above).

57.     Upon information and belief, Defendants also provide a message which contains information regarding a temperature during the shipment or the transportation, a change in a shipment or transportation temperature, or an impact or force exerted on the shipment conveyance device. For example, the sensors located inside the container detect a deviation in temperature and consequently alerts ("message") are transmitted to a dashboard/portal used by Defendants' customers. Therefore, the message contains information regarding at least one of temperature of shipment and a change in shipment temperature.  Further, the sensors located inside the container, measure information including, but not limited to, shock, motion, tamper and vibration experienced by the container. Therefore, the message contains information regarding an impact or force exerted on the shipment conveyance device (*See* Figures 9, 10 and 16-18 above).

58.     Upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a deviation from a pre-determined shipment or transportation route associated with a shipment or a transportation of or involving the shipment conveyance device.  For

example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or deviations in route ("transportation route associated with a shipment") of the container. This allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a pre-determined transportation route (*See* Figures 9-11 and 17 above).

59.   To the extent Defendants continue, and have continued, their infringing activities noted above in an infringing manner post-notice of the '109 Patent, such infringement is necessarily willful and deliberate.

60.   On information and belief, Defendants have a policy or practice of not reviewing the patents of others.  Further on information and belief, Defendants instruct its employees to not review the patents of others for clearance or to assess infringement thereof.  As such, Defendants have been willfully blind to the patent rights of Plaintiff.

61.   Each of Defendants' aforesaid activities has been without authority and/or license from Plaintiff.

### COUNT II

### (Infringement of U.S. Patent No. 9,847,029)

62.   Plaintiff incorporates the above paragraphs by reference.

63.   Defendants have been on actual notice of the '029 Patent at least as early as the date it received service of this Original Complaint.

64.   On information and belief, Defendants own and control the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

65.    Upon information and belief, Defendants have directly infringed and continues to directly infringe at least Claims 2, 12, 15, 18 and 19 of the '029 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

66.    Defendants, with knowledge of the '029 Patent, also infringe at least Claims 2, 12, 15, 18 and 19 of the '029 Patent by inducing others to infringe the '029 Patent.   In particular, Defendants intend to induce its customers to infringe the '029 Patent by encouraging its customers to use the Accused Instrumentalities in a manner that results in infringement.

67.    Defendants also induce others, including its customers, to infringe at least Claims 2, 12, 15, 18 and 19 of the '029 Patent by providing technical support for the use of the Accused Instrumentalities.

68.    As described above (*see* ¶ 47), and upon information and belief, Defendants make, use, sell and offer for sale an apparatus, comprising, a shipment conveyance device, wherein the shipment conveyance device is a shipping container, a pallet, or a piece of luggage.   For example, Defendants provide reefer cargo containers such as 20' standard Reefer, 40' High Cube Standard Reefer, 40' High Cube Magnum Reefer, 40' High Cube StarCare and/or 40' High Cube Super Freezer (each being a "shipment conveyance device") for shipping and/or delivering goods, products, items, and/or other objects.   Further, the cargo containers are equipped with Maersk Remote Container Management (RCM) technology/system. Remote Container Management (RCM) employs a network of sensors and GPS device to monitor the cargo, container, and the environment inside the container.

69.    As described above (*see* ¶ 48), and upon information and belief, Defendants provide a global positioning device, wherein the global positioning device is located in, on, or at, the shipment conveyance device, and further wherein the global positioning device determines a position

or location of the shipment conveyance device.  By way of example, the containers are installed with GPS device ("Global Positioning System") for cargo tracking, monitoring and/or remote management. The GPS tracking determines a position or location of the container ("shipment conveyance device").

70.    As described above (*see* ¶ 49), and upon information and belief, Defendants also provide a processor, wherein the processor processes information regarding the shipment conveyance device in response to an occurrence of an event or in response to a request for information regarding the shipment conveyance device, and further wherein the processor generates a message in response to the occurrence of the event or in response to the request for information regarding the shipment conveyance device.  For example, the reefer cargo containers are equipped with a processor integrated with the sensors to measure information including one or more of, but not limited to, door, humidity, light, vibration, temperature, ventilation, $CO_2$, shock, motion, and buzzer experienced by the container. Therefore, Defendants provide a processor in the shipping container which processes information regarding the shipment conveyance device. For example, the processor integrated with the sensors detects an event including one or more of, but not limited to, tampering of cargo, deviation in temperature, deviation in humidity, deviation in $CO_2$, load-loss, theft, delay, deviation in planned route, cargo impact, shock and damage and in response to the detected event, sends alerts ("message") containing information about the event to the customers of Defendants. For example, Defendants utilize Captain Peter (*see* ¶ 49), a visibility tool, to provide its customers a dashboard/portal where its customers track their shipments and view information and alerts ("message") regarding the shipment as well as the shipment

conveyance device, and therefore, provides a message in response to the occurrence of an event or in response to a request for information regarding the shipment conveyance device.

71.    As described above (*see* ¶ 50), and upon information and belief, Defendants provide a transmitter, wherein the transmitter is located in, on, or at, the shipment conveyance device, and further wherein the transmitter transmits the message to a communication device associated with an owner of the shipment conveyance device, a receiver of the shipment conveyance device, or an individual authorized to receive the message.  For example, the reefer cargo containers ("shipment conveyance device") send information ("message") including one or more of, but not limited to, container's location, power status, temperature, humidity, $CO_2$ levels and ventilation settings, to Defendants' customers via Remote Container Management (RCM). As a result, Defendants' customers monitor their shipments present in the shipping containers using a dashboard/portal provided by Defendants. Therefore, the containers comprise a transmitter for transmitting a message to a communication device associated with at least an owner or a receiver of the shipment conveyance device (*See* Figures 9-16 above). See also Figures 17-22 below, which are screenshots of webpages found at www.maersk.com, indicating that messages containing information are sent to Defendants' customers.

72.    As described above (*see* ¶ 51), and upon information and belief, Defendant provides a sensor, wherein the sensor monitors or measures a temperature during a shipment or a transportation of the shipment conveyance device, a shock exerted on the shipment conveyance device, an impact exerted on the shipment conveyance device, or a force exerted on the shipment conveyance device.  This element is infringed literally, or in the alternative, under the doctrine of equivalents. For example, Defendants' shipping containers comprise sensors

including at least one or more of, but not limited to, a vibration sensor, temperature sensor, shock sensor, motion sensor and tamper sensor for measuring at least one or more of, but not limited to, temperature, shock, impact, motion and tampering experienced by the container during transportation. Therefore, Defendants' apparatus comprise sensors that monitor and measure at least one or more of, but not limited to, temperature, shock, impact and force experienced by the shipment conveyance device.

73.   As described above (*see* ¶ 52), and upon information and belief, Defendants also provide a message which contains information regarding a temperature during the shipment or the transportation, a change in a shipment or transportation temperature, or an impact or force exerted on the shipment conveyance device.   For example, the sensors located inside the container detect a deviation in temperature and consequently alerts ("message") are transmitted to a dashboard/portal used by Defendants' customers. Therefore, the message contains information regarding at least one of temperature of shipment and a change in shipment temperature.   Further, the sensors located inside the container, measure information including, but not limited to, shock, motion, tamper and vibration experienced by the container. Therefore, the message contains information regarding an impact or force exerted on the shipment conveyance device.

74.   As described above (*see* ¶ 53), and upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a deviation from a pre-determined shipment or transportation route associated with a shipment or a transportation of or involving the shipment conveyance device.   For example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or deviations in route ("transportation route associated with a shipment") of the container. This

allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a predetermined transportation route.

75. To the extent Defendants continue, and have continued, their infringing activities noted above in an infringing manner post-notice of the '029 Patent, such infringement is necessarily willful and deliberate.

76. On information and belief, Defendants have a policy or practice of not reviewing the patents of others.  Further on information and belief, Defendants instruct its employees to not review the patents of others for clearance or to assess infringement thereof.  As such, Defendants have been willfully blind to the patent rights of Plaintiff.

77. Each of Defendants' aforesaid activities has been without authority and/or license from Plaintiff.

## COUNT III

### (Infringement of U.S. Patent No. 7,482,920)

78. Plaintiff incorporates the above paragraphs by reference.

79. Defendants have been on actual notice of the '920 Patent at least as early as the date it received service of this Original Complaint.

80. On information and belief, Defendants own and control the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

81. Upon information and belief, Defendants have directly infringed and continue to directly infringe at least Claims 1, 5, 9, 11, 12, 14 and 16 of the '920 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

82.   Defendants, with knowledge of the '920 Patent, also infringe at least Claims 1, 5, 9, 11, 12, 14 and 16 of the '920 Patent by inducing others to infringe the '920 Patent.  In particular, Defendants intend to induce its customers to infringe the '920 Patent by encouraging its customers to use the Accused Instrumentalities in a manner that results in infringement.

83.   Defendants also induce others, including its customers, to infringe at least Claims 1, 5, 9, 11, 12, 14 and 16 of the '920 Patent by providing technical support for the use of the Accused Instrumentalities.

84.   As described above (*see* ¶ 47), and upon information and belief, Defendants make, use, sell and offer for sale an apparatus, comprising, a shipment conveyance device, wherein the shipment conveyance device is a shipping container, a pallet, or a piece of luggage.  For example, Defendants provide reefer cargo containers such as 20' standard Reefer, 40' High Cube Standard Reefer, 40' High Cube Magnum Reefer, 40' High Cube StarCare and/or 40' High Cube Super Freezer (each being a "shipment conveyance device") for shipping and/or delivering goods, products, items, and/or other objects.  Further, the cargo containers are equipped with Maersk Remote Container Management (RCM) technology/system. Remote Container Management (RCM) employs a network of sensors and GPS device to monitor the cargo, container, and the environment inside the container.

85.   Upon information and belief, Defendants provide a memory device, wherein the memory device is located in, on, or at, the shipment conveyance device, wherein the memory device stores information regarding a description of a good, product, or item, being shipped or transported via or which is contained in or on the shipment conveyance device, and origination information, sender information, shipper information, destination information, receiver information, handling instruction information, delivery instruction information,

invoice information, packing slip information, delivery time information, or payment instruction information, regarding the shipment conveyance device. For example, the reefer cargo containers are equipped with a memory device integrated with sensors including at least one of temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, door sensor, tamper sensor, vibration sensor, motion sensor and shock sensor to store information related to the goods, items and/or products inside the reefer containers. As a further example, the memory device integrated with the internal sensors stores at least an identification of Defendants (since it communicates position of the container and measurements from the sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor to Defendants' server), and therefore stores at least one or more of origination information, sender information, and shipper information regarding the shipment conveyance device. As a further example, the memory device integrated with the internal sensors stores at least an identification of Defendants' container (since it communicates position of the container and measurements from the sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, $CO_2$ sensor, temperature sensor, humidity sensor, ventilation sensor, shock sensor, motion sensor, and tamper sensor to Defendants' server), and therefore stores at least one or more of origination information, sender information, and shipper information regarding the shipment conveyance device. As a further example, the memory device integrated with the sensors stores at least an identification of Defendants' customer (since it communicates position of the container and measurements from the sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$

sensor, shock sensor, motion sensor, and tamper sensor to Defendants' server and Defendants (who may have multiple customers availing Defendants' services at any given time) correlate the information to the particular customer in order to provide updates to the customer), and therefore stores at least one or more of origination information, sender information, shipper information, destination information and receiver information regarding the shipment conveyance device. As a further example, the memory device stores at least a description of a good, product, or item, being shipped via the shipment conveyance device, because it identifies the position/location and sends the measurements from sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor of each individual shipment to the Defendants' server and/or Defendants' customer (who may have multiple shipments in transit at a given time). As a further example, the memory device stores measurements from one or more of door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor and therefore stores a description of a good, product, or item, being shipped via the shipment conveyance device. Further, the memory device stores GPS data and/or geofencing parameters allowing Defendants and/or the customer to receive alerts regarding arrival times, GPS time-in-transit data and/or deviation of the shipment from the planned route. Therefore, the memory device stores at least destination information regarding the shipment conveyance device. Further, the memory device stores measurements and alerts regarding tampering, shocks, vibrations, temperature, gases and other handling parameters – and therefore stores at least handling instruction information for the shipment conveyance device. *See* Figures 5, 6, 9-18, 20 and 22 above.

86.  As described above (*see* ¶ 48), and upon information and belief, Defendants provide a global positioning device, wherein the global positioning device is located in, on, or at, the shipment conveyance device, and further wherein the global positioning device determines a position or location of the shipment conveyance device.   By way of example, the containers are installed with GPS device ("Global Positioning System") for cargo tracking, monitoring and/or remote management. The GPS tracking determines a position or location of the container ("shipment conveyance device").

87.  As described above (*see* ¶ 49), and upon information and belief, Defendants also provide a processing device, wherein the processing device processes information regarding the shipment conveyance device in response to an occurrence of an event or in response to a request for information regarding the shipment conveyance device, and further wherein the processor generates a message in response to the occurrence of the event or in response to the request for information regarding the shipment conveyance device.   For example, the reefer cargo containers are equipped with a processing device integrated with the sensors to measure information including one or more of, but not limited to, door, humidity, light, vibration, temperature, ventilation, $CO_2$, shock, motion, and buzzer experienced by the container. Therefore, Defendants provides a processor in the shipping container which processes information regarding the shipment conveyance device. For example, the processing device integrated with the sensors detects an event including one or more of, but not limited to, tampering of cargo, deviation in temperature, deviation in humidity, deviation in $CO_2$, load-loss, theft, delay, deviation in planned route, cargo impact, shock and damage and in response to the detected event, sends alerts ("message") containing information about the event to the customers of Defendants. For example, Defendants utilize Captain Peter (*see*

¶ 49), a visibility tool, to provide its customers a dashboard/portal where its customers track their shipments and view information and alerts ("message") regarding the shipment as well as the shipment conveyance device, and therefore, provides a message in response to the occurrence of an event or in response to a request for information regarding the shipment conveyance device.

88.   As described above (*see* ¶ 50), and upon information and belief, Defendants provide a transmitter, wherein the transmitter is located in, on, or at, the shipment conveyance device, and further wherein the transmitter transmits the message to a communication device associated with an owner of the shipment conveyance device, a receiver of the shipment conveyance device, or an individual authorized to receive the message.  For example, the reefer cargo containers ("shipment conveyance device") send information ("message") including one or more of, but not limited to, container's location, power status, temperature, humidity, $CO_2$ levels and ventilation settings, to Defendants' customers via Remote Container Management (RCM). As a result, Defendants' customers monitor their shipments present in the shipping containers using a dashboard/portal provided by Defendants. Therefore, the containers comprise a transmitter for transmitting a message to a communication device associated with at least an owner or a receiver of the shipment conveyance device.

89.   As described above (*see* ¶ 51), and upon information and belief, Defendants provide a sensor, wherein the sensor monitors or measures a temperature during a shipment or a transportation of the shipment conveyance device, a shock exerted on the shipment conveyance device, an impact exerted on the shipment conveyance device, or a force exerted on the shipment conveyance device.  This element is infringed literally, or in the alternative, under the

doctrine of equivalents. For example, Defendants' shipping containers comprise sensors including at least one or more of, but not limited to, a vibration sensor, temperature sensor, shock sensor, motion sensor and tamper sensor for measuring at least one or more of, but not limited to, temperature, shock, impact, motion and tampering experienced by the container during transportation. Therefore, Defendants' apparatus comprises sensors that monitor and measure at least one or more of, but not limited to, temperature, shock, impact and force experienced by the shipment conveyance device.

90.     As described above (*see* ¶ 52), and upon information and belief, Defendants also provide a message which contains information regarding a temperature during the shipment or the transportation, a change in a shipment or transportation temperature, or an impact or force exerted on the shipment conveyance device.  For example, the sensors located inside the container detect a deviation in temperature and consequently alerts ("message") are transmitted to a dashboard/portal used by Defendants' customers. Therefore, the message contains information regarding at least one of temperature of shipment and a change in shipment temperature.  Further, the sensors located inside the container, measure information including, but not limited to, shock, motion, tamper and vibration experienced by the container. Therefore, the message contains information regarding an impact or force exerted on the shipment conveyance device.

91.     As described above (*see* ¶ 53), and upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a deviation from a pre-determined shipment or transportation route associated with a shipment or a transportation of or involving the shipment conveyance device.  For example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or

deviations in route ("transportation route associated with a shipment") of the container. This allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a predetermined transportation route.

92.   Upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a shipment or transportation temperature which deviates from a shipment or transportation temperature requirement. For example, the alerts related to temperature excursion/deviation inside a container are transmitted to Defendants' servers and/or its customers, and therefore, detects events including, but not limited to, deviation in shipment temperature. *See* Figures 9, 10, 16 and 18 above.

93.   Upon information and belief, Defendants further provide an apparatus wherein the event is a detection of an impact experienced by the shipment conveyance device, a mishandling of the shipment conveyance device, a dropping of the shipment conveyance device, and an accident involving the shipment conveyance device.  For example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or deviations in route ("transportation route associated with a shipment") of the container. This allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a predetermined transportation route (*See* Figure 17 above).

94.   To the extent Defendants continue, and have continued, their infringing activities noted above in an infringing manner post-notice of the '920 Patent, such infringement is necessarily willful and deliberate.

95. On information and belief, Defendants have a policy or practice of not reviewing the patents of others. Further on information and belief, Defendants instruct its employees to not review the patents of others for clearance or to assess infringement thereof. As such, Defendants have been willfully blind to the patent rights of Plaintiff.

96. Each of Defendants' aforesaid activities has been without authority and/or license from Plaintiff.

## COUNT IV

### (Infringement of U.S. Patent No. 10,796,268)

97. Plaintiff incorporates the above paragraphs by reference.

98. Defendants have been on actual notice of the '268 Patent at least as early as the date it received service of this Original Complaint.

99. On information and belief, Defendants own and control the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

100. Upon information and belief, Defendants have directly infringed and continue to directly infringe at least Claims 1, 8 , 10 and 12 of the '268 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

101. Defendants, with knowledge of the '268 Patent, also infringe at least Claims 1, 8 , 10 and 12 of the '268 Patent by inducing others to infringe the '268 Patent. In particular, Defendants intend to induce its customers to infringe the '268 Patent by encouraging its customers to use the Accused Instrumentalities in a manner that results in infringement.

102. Defendants also induce others, including its customers, to infringe at least Claims 1, 8 , 10 and 12 of the '268 Patent by providing technical support for the use of the Accused Instrumentalities.

103.   As described above (*see* ¶ 47), and upon information and belief, Defendants make, use, sell and offer for sale an apparatus, comprising, a shipment conveyance device, wherein the shipment conveyance device is a shipping container, a pallet, or a piece of luggage.   For example, Defendants provide reefer cargo containers such as 20' standard Reefer, 40' High Cube Standard Reefer, 40' High Cube Magnum Reefer, 40' High Cube StarCare and/or 40' High Cube Super Freezer (each being a "shipment conveyance device") for shipping and/or delivering goods, products, items, and/or other objects.   Further, the cargo containers are equipped with Maersk Remote Container Management (RCM) technology/system. Remote Container Management (RCM) employs a network of sensors and GPS device to monitor the cargo, container, and the environment inside the container.

104.   As described above (*see* ¶ 48), and upon information and belief, Defendants provide a global positioning device, wherein the global positioning device is located in, on, or at, the shipment conveyance device, and further wherein the global positioning device determines a position or location of the shipment conveyance device.   By way of example, the containers are installed with GPS device ("Global Positioning System") for cargo tracking, monitoring and/or remote management. The GPS tracking determines a position or location of the container ("shipment conveyance device").

105.   As described above (*see* ¶ 49), and upon information and belief, Defendants also provide a processing device, wherein the processing device processes information regarding the shipment conveyance device in response to an occurrence of an event or in response to a request for information regarding the shipment conveyance device, and further wherein the processor generates a message in response to the occurrence of the event or in response to the request for information regarding the shipment conveyance device.   For example, the reefer

cargo containers are equipped with a processing device integrated with the sensors to measure information including one or more of, but not limited to, door, humidity, light, vibration, temperature, ventilation, $CO_2$, shock, motion, and buzzer experienced by the container. Therefore, Defendants provide a processor in the shipping container which processes information regarding the shipment conveyance device. For example, the processing device integrated with the sensors detects an event including one or more of, but not limited to, tampering of cargo, deviation in temperature, deviation in humidity, deviation in $CO_2$, load-loss, theft, delay, deviation in planned route, cargo impact, shock and damage and in response to the detected event, sends alerts ("message") containing information about the event to the customers of Defendants. For example, Defendants utilize Captain Peter (*see* ¶ 49), a visibility tool, to provide its customers a dashboard/portal where its customers track their shipments and view information and alerts ("message") regarding the shipment as well as the shipment conveyance device, and therefore, provides a message in response to the occurrence of an event or in response to a request for information regarding the shipment conveyance device.

106.    As described above (*see* ¶ 50), and upon information and belief, Defendants provide a transmitter, wherein the transmitter is located in, on, or at, the shipment conveyance device, and further wherein the transmitter transmits the message to a communication device associated with an owner of the shipment conveyance device, a receiver of the shipment conveyance device, or an individual authorized to receive the message.  For example, the reefer cargo containers ("shipment conveyance device") send information ("message") including one or more of, but not limited to, container's location, power status, temperature, humidity, $CO_2$ levels and ventilation settings, to Defendants' customers via Remote

Container Management (RCM). As a result, Defendants' customers monitor their shipments present in the shipping containers using a dashboard/portal provided by Defendants. Therefore, the containers comprise a transmitter for transmitting a message to a communication device associated with at least an owner or a receiver of the shipment conveyance device.

107. As described above (*see* ¶ 51), and upon information and belief, Defendants provide a sensor, wherein the sensor monitors or measures a temperature during a shipment or a transportation of the shipment conveyance device, a shock exerted on the shipment conveyance device, an impact exerted on the shipment conveyance device, or a force exerted on the shipment conveyance device.  This element is infringed literally, or in the alternative, under the doctrine of equivalents. For example, Defendants' shipping containers comprise sensors including at least one or more of, but not limited to, a vibration sensor, temperature sensor, shock sensor, motion sensor and tamper sensor for measuring at least one or more of, but not limited to, temperature, shock, impact, motion and tampering experienced by the container during transportation. Therefore, Defendants' apparatus comprises sensors that monitor and measure at least one or more of, but not limited to, temperature, shock, impact and force experienced by the shipment conveyance device.

108. As described above (*see* ¶ 52), and upon information and belief, Defendants also provide a message which contains information regarding a temperature during the shipment or the transportation, a change in a shipment or transportation temperature, or an impact or force exerted on the shipment conveyance device.  For example, the sensors located inside the container detect a deviation in temperature and consequently alerts ("message") are transmitted to a dashboard/portal used by Defendants' customers. Therefore, the message

contains information regarding at least one of temperature of shipment and a change in shipment temperature.  Further, the sensors located inside the container, measure information including, but not limited to, shock, motion, tamper and vibration experienced by the container. Therefore, the message contains information regarding an impact or force exerted on the shipment conveyance device.

109.   As described above (*see* ¶ 53), and upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a deviation from a pre-determined shipment or transportation route associated with a shipment or a transportation of or involving the shipment conveyance device.  For example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or deviations in route ("transportation route associated with a shipment") of the container. This allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a predetermined transportation route.

110.   To the extent Defendants continue, and have continued, their infringing activities noted above in an infringing manner post-notice of the '268 Patent, such infringement is necessarily willful and deliberate.

111.   On information and belief, Defendants have a policy or practice of not reviewing the patents of others.  Further on information and belief, Defendants instruct its employees to not review the patents of others for clearance or to assess infringement thereof.  As such, Defendants have been willfully blind to the patent rights of Plaintiff.

112.   Each of Defendants' aforesaid activities has been without authority and/or license from Plaintiff.

## COUNT V

### (Infringement of U.S. Patent No. 7,253,731)

113.   Plaintiff incorporates the above paragraphs by reference.

114.   Defendants have been on actual notice of the '731 Patent at least as early as the date it received service of this Original Complaint.

115.   On information and belief, Defendants own and control the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

116.   Upon information and belief, Defendants have directly infringed and continue to directly infringe at least Claims 1, 5, 9, 11, 12, 14 and 16 of the '731 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

117.   Defendants, with knowledge of the '731 Patent, also infringe at least Claims 1, 5, 9, 11, 12, 14 and 16 of the '731 Patent by inducing others to infringe the '731 Patent.  In particular, Defendants intend to induce its customers to infringe the '731 Patent by encouraging its customers to use the Accused Instrumentalities in a manner that results in infringement.

118.   Defendants also induce others, including its customers, to infringe at least Claims 11, 5, 9, 11, 12, 14 and 16 of the '268 Patent by providing technical support for the use of the Accused Instrumentalities.

119.   As described above (*see* ¶ 47), and upon information and belief, Defendants make, use, sell and offer for sale an apparatus, comprising, a shipment conveyance device, wherein the shipment conveyance device is a shipping container, a pallet, or a piece of luggage.  For example, Defendants provide reefer cargo containers such as 20' standard Reefer, 40' High Cube Standard Reefer, 40' High Cube Magnum Reefer, 40' High Cube StarCare and/or 40' High Cube Super Freezer (each being a "shipment conveyance device") for shipping and/or

delivering goods, products, items, and/or other objects.  Further, the cargo containers are equipped with Maersk Remote Container Management (RCM) technology/system. Remote Container Management (RCM) employs a network of sensors and GPS device to monitor the cargo, container, and the environment inside the container.

120.   Upon information and belief, Defendants provide a memory device, wherein the memory device is located in, on, or at, the shipment conveyance device, wherein the memory device stores information regarding a description of a good, product, or item, being shipped or transported via or which is contained in or on the shipment conveyance device, and origination information, sender information, shipper information, destination information, receiver information, handling instruction information, delivery instruction information, invoice information, packing slip information, delivery time information, or payment instruction information, regarding the shipment conveyance device. For example, the reefer cargo containers are equipped with a memory device integrated with sensors including at least one of temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, door sensor, tamper sensor, vibration sensor, motion sensor and shock sensor to store information related to the goods, items and/or products inside the reefer containers. As a further example, the memory device integrated with the internal sensors stores at least an identification of Defendants (since it communicates position of the container and measurements from the sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor to Defendants' server), and therefore stores at least one or more of origination information, sender information, and shipper information regarding the shipment conveyance device. As a further example, the memory device integrated with the

internal sensors stores at least an identification of Defendants' container (since it communicates position of the container and measurements from the sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, $CO_2$ sensor, temperature sensor, humidity sensor, ventilation sensor, shock sensor, motion sensor, and tamper sensor to Defendants' server), and therefore stores at least one or more of origination information, sender information, and shipper information regarding the shipment conveyance device. As a further example, the memory device integrated with the sensors stores at least an identification of Defendants' customer (since it communicates position of the container and measurements from the sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor to Defendants' server and Defendants (who may have multiple customers availing Defendants' services at any given time) correlates the information to the particular customer in order to provide updates to the customer), and therefore stores at least one or more of origination information, sender information, shipper information, destination information and receiver information regarding the shipment conveyance device. As a further example, the memory device stores at least a description of a good, product, or item, being shipped via the shipment conveyance device, because it identifies the position/location and sends the measurements from sensors including but not limited to door sensor, humidity sensor, light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor of each individual shipment to the Defendants' server and/or Defendants' customer (who may have multiple shipments in transit at a given time). As a further example, the memory device stores measurements from one or more of door sensor, humidity sensor,

light sensor, vibration sensor, temperature sensor, humidity sensor, ventilation sensor, $CO_2$ sensor, shock sensor, motion sensor, and tamper sensor and therefore stores a description of a good, product, or item, being shipped via the shipment conveyance device. Further, the memory device stores GPS data and/or geofencing parameters allowing Defendants and/or the customer to receive alerts regarding arrival times, GPS time-in-transit data and/or deviation of the shipment from the planned route. Therefore, the memory device stores at least destination information regarding the shipment conveyance device. Further, the memory device stores measurements and alerts regarding tampering, shocks, vibrations, temperature, gases and other handling parameters – and therefore stores at least handling instruction information for the shipment conveyance device. *See* Figures 5, 6, 9-18, 20 and 22 above.

121.  As described above (*see* ¶ 48), and upon information and belief, Defendants provide a global positioning device, wherein the global positioning device is located in, on, or at, the shipment conveyance device, and further wherein the global positioning device determines a position or location of the shipment conveyance device.  By way of example, the containers are installed with GPS device ("Global Positioning System") for cargo tracking, monitoring and/or remote management. The GPS tracking determines a position or location of the container ("shipment conveyance device").

122.  As described above (*see* ¶ 49), and upon information and belief, Defendants also provide a processing device, wherein the processing device processes information regarding the shipment conveyance device in response to an occurrence of an event or in response to a request for information regarding the shipment conveyance device, and further wherein the processor generates a message in response to the occurrence of the event or in response to the request for information regarding the shipment conveyance device.  For example, the reefer

cargo containers are equipped with a processing device integrated with the sensors to measure information including one or more of, but not limited to, door, humidity, light, vibration, temperature, ventilation, $CO_2$, shock, motion, and buzzer experienced by the container. Therefore, Defendants provide a processor in the shipping container which processes information regarding the shipment conveyance device. For example, the processing device integrated with the sensors detects an event including one or more of, but not limited to, tampering of cargo, deviation in temperature, deviation in humidity, deviation in $CO_2$, load-loss, theft, delay, deviation in planned route, cargo impact, shock and damage and in response to the detected event, sends alerts ("message") containing information about the event to the customers of Defendants. For example, Defendants utilize Captain Peter (*see* ¶ 49), a visibility tool, to provide its customers a dashboard/portal where its customers track their shipments and view information and alerts ("message") regarding the shipment as well as the shipment conveyance device, and therefore, provides a message in response to the occurrence of an event or in response to a request for information regarding the shipment conveyance device.

123.   As described above (*see* ¶ 50), and upon information and belief, Defendants provide a transmitter, wherein the transmitter is located in, on, or at, the shipment conveyance device, and further wherein the transmitter transmits the message to a communication device associated with an owner of the shipment conveyance device, a receiver of the shipment conveyance device, or an individual authorized to receive the message.  For example, the reefer cargo containers ("shipment conveyance device") send information ("message") including one or more of, but not limited to, container's location, power status, temperature, humidity, $CO_2$ levels and ventilation settings, to Defendants' customers via Remote

Container Management (RCM). As a result, Defendants' customers monitor their shipments present in the shipping containers using a dashboard/portal provided by Defendants. Therefore, the containers comprise a transmitter for transmitting a message to a communication device associated with at least an owner or a receiver of the shipment conveyance device.

124. As described above (*see* ¶ 51), and upon information and belief, Defendants provide a sensor, wherein the sensor monitors or measures a temperature during a shipment or a transportation of the shipment conveyance device, a shock exerted on the shipment conveyance device, an impact exerted on the shipment conveyance device, or a force exerted on the shipment conveyance device.  This element is infringed literally, or in the alternative, under the doctrine of equivalents. For example, Defendants' shipping containers comprise sensors including at least one or more of, but not limited to, a vibration sensor, temperature sensor, shock sensor, motion sensor and tamper sensor for measuring at least one or more of, but not limited to, temperature, shock, impact, motion and tampering experienced by the container during transportation. Therefore, Defendants' apparatus comprises sensors that monitor and measure at least one or more of, but not limited to, temperature, shock, impact and force experienced by the shipment conveyance device.

125. As described above (*see* ¶ 52), and upon information and belief, Defendants also provide a message which contains information regarding a temperature during the shipment or the transportation, a change in a shipment or transportation temperature, or an impact or force exerted on the shipment conveyance device.  For example, the sensors located inside the container detect a deviation in temperature and consequently alerts ("message") are transmitted to a dashboard/portal used by Defendants' customers. Therefore, the message

contains information regarding at least one of temperature of shipment and a change in shipment temperature.  Further, the sensors located inside the container, measure information including, but not limited to, shock, motion, tamper and vibration experienced by the container. Therefore, the message contains information regarding an impact or force exerted on the shipment conveyance device.

126.   As described above (*see* ¶ 53), and upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a deviation from a pre-determined shipment or transportation route associated with a shipment or a transportation of or involving the shipment conveyance device.  For example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or deviations in route ("transportation route associated with a shipment") of the container. This allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a predetermined transportation route.

127.   Upon information and belief, Defendants further provide an apparatus wherein the event is a detection of a shipment or transportation temperature which deviates from a shipment or transportation temperature requirement. For example, the alerts related to temperature excursion/deviation inside a container are transmitted to Defendants' servers and/or its customers, and therefore, detects events including, but not limited to, deviation in shipment temperature. *See* Figures 9, 10, 16 and 18 above.

128.   Upon information and belief, Defendants further provide an apparatus wherein the event is a detection of at least one of of an impact experienced by the shipment conveyance device,  a force experienced   the   shipment   conveyance   device,   a   mishandling   of   the   shipment

conveyance device, a dropping of the shipment conveyance device, and an accident involving the shipment conveyance device.  For example, the reefer cargo containers are fitted with a GPS device to determine GPS data, arrival times, geo-fencing parameter, position/location and/or deviations in route ("transportation route associated with a shipment") of the container. This allows Defendants and/or the customer to receive alerts if the container deviates from the planned route. Therefore, the event is related to deviation from a predetermined transportation route (*See* Figure 17 above).

129.   To the extent Defendants continue, and have continued, their infringing activities noted above in an infringing manner post-notice of the '731 Patent, such infringement is necessarily willful and deliberate.

130.   On information and belief, Defendants have a policy or practice of not reviewing the patents of others.  Further on information and belief, Defendants instruct its employees to not review the patents of others for clearance or to assess infringement thereof.  As such, Defendants have been willfully blind to the patent rights of Plaintiff.

131.   Each of Defendants' aforesaid activities has been without authority and/or license from Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Transcend respectfully requests the Court enter judgment against Defendants:

1.   Declaring that Defendants have infringed each of the Transcend Patents;

2.   Declaring that Defendants' infringement of each of the Transcend Patents has been willful and deliberate;

3.      Awarding Transcend compensatory damages as a result of Defendants' infringement of the Transcend Patents;

4.      Awarding Transcend treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of Defendants' willful and deliberate infringement of the Transcend Patents;

5.      Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Transcend Patents;

6.      Awarding Transcend its costs, attorneys' fees, expenses, and interest;

7.      Awarding Transcend ongoing post-trial royalties; and

8.      Granting Transcend such further relief as the Court finds appropriate.


## JURY DEMAND

Transcend demands trial by jury, under Fed. R. Civ. P. 38.

Dated:  December 9, 2020

Respectfully Submitted

*/s/ Thomas Fasone III*
Thomas Fasone III
Texas Bar No. 00785382
tfasone@ghiplaw.com
M. Scott Fuller
Texas Bar No. 24036607
sfuller@ghiplaw.com
Randall T. Garteiser
Texas Bar No. 24038912
rgarteiser@ghiplaw.com
René A. Vazquez
*Pro Hac Vice Anticipated*
rvazquez@ghiplaw.com
Christopher A. Honea
*Pro Hac Vice Anticipated*
chonea@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400

**ATTORNEYS FOR
TRANSCEND LLC**